SCHEDULED FOR ORAL ARGUMENT ON JANUARY 6, 2017

No. 15-7128
(consolidated with Nos. 15-7129, 15-7130, 15-7131, 15-7132, 15-7133, 15-7134)

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GERALD BURTON, *et al.*,
PLAINTIFFS-APPELLEES,

WAYNE NELSON, *et al.*,
PLAINTIFFS-APPELLANTS,

V.

DISTRICT OF COLUMBIA,
DEFENDANT-APPELLEE.

ON APPEALS FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEE DISTRICT OF COLUMBIA**

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici*.—Charles Florence, Daniel Botts, Sr., Joshua Fuller, Wayne Nelson, Charles Rayford, Gerald Burton, and Charles Addo were plaintiffs below. Each is an appellant in one of these consolidated cases (though Fuller does not actually present argument in his brief) and an appellee in the remaining cases. James Johnson, John Thomas, Anthony Williams, Tawanna Robinson, Michael Sims, Albert E. Montgomery, Christopher Walker, Lawrence L. Clark, Kwame O. Agyeman, Robert Pearson, Jonathan Morris, and Antoine Williams were plaintiffs below. Because they did not file appeals, they are appellees in all of these consolidated cases. The District of Columbia was the defendant below and is an appellee here. There are no amici.

B. *Ruling under review*.— Florence, Botts, Fuller, Nelson, Rayford, Burton, and Addo appeal the order entered on October 9, 2015, by District Court Judge Beryl A. Howell, granting summary judgment in favor of the District. (ECF Docket Nos. 223, 224).

C. *Related cases*.—There are no related cases.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE.................................................................2

    1.    The Department Disciplines Four Employees. ....................................2

        A.    Lieutenant Charles Addo is suspended twice for missing three medical appointments. ......................................................3

        B.    Lieutenant Gerald Burton is suspended for violating direct orders and failing to follow standard operating guidelines. ................................................................5

        C.    Lieutenant Charles Florence resigns after a trial board finds him guilty of sexual harassment and recommends a demotion and suspension. ..........................................9

        D.    Firefighter Charles Rayford is suspended for unsafe driving and misleading his supervisor; he later is terminated for multiple failed drug tests.................................12

    2.    During The 2010 Promotional Examination, All Candidates, Including Firefighter Wayne Nelson, Are Instructed To Write Their Names On Their Tests. ...............................................17

    3.    The Department Requires All Employees, Including Fire Inspector Daniel Botts, To Be Certified As Emergency Medical Technicians...............................................................19

    4.    Addo and Botts Encounter Workplace Hostility That They Believe Is Based On Race. ............................................21

        A.    Addo's performance is criticized by two successive supervisors. ..............................................................21

        B.    Botts overhears a supervisor using a racial slur, and encounters other workplace difficulties he believes are based on race.....................................................23

        C.    Rayford is suspended and terminated. ......................................25

5.    The District Court Enters Summary Judgment In Favor Of The District. ...................................................................................25

STANDARD OF REVIEW .................................................................................30

SUMMARY OF ARGUMENT ............................................................................31

ARGUMENT .......................................................................................................34

I.    The Employees Have Offered Insufficient Evidence That They Suffered Disparate Discipline On The Basis Of Race. .......................34

A.    Addo was not similarly situated to Caucasian employees who missed Clinic appointments, nor was he punished more severely. ..........................................................................39

B.    Burton offers no evidence that any other employee disobeyed a direct order by responding to a fire when told to disregard, or failed to comply with standard operating procedures by ensuring a continuous water supply before entering a burning building. ...............................42

C.    Florence offers no evidence that any Caucasian employees engaged in substantially similar sexual harassment of female employees. ...........................................45

D.    Rayford offers no evidence of pretext in his suspension or termination. ......................................................................49

1.    Rayford does not identify any other employees charged with misleading their supervisors into believing they were carrying a valid driver's license. ........................................................................49

2.    Rayford does not identify any other employees who tested positive for marijuana but were excused from the substance-abuse program. .................51

II.    Nelson Offered Insufficient Evidence That The District Of Columbia Discriminated Against Him In Its Administration Of The 2010 Promotional Exam. ..............................................................53

iii

    A.    Nelson has not shown that the procedures he challenges were caused by a policy or practice of the District of Columbia. ................................................................................53

    B.    Alternatively, Nelson has not shown any evidence of racial bias in the exam process...................................................57

III.    Botts Offered Insufficient Evidence That The District Of Columbia Discriminated Against Him By Detailing Him To The Training Academy.......................................................................60

    A.    Botts has not shown that any exemption for Caucasian fire inspectors was caused by a policy or practice of the District of Columbia. ..................................................60

    B.    Alternatively, Botts has offered no evidence that Caucasian fire inspectors were exempt from the EMT certification requirement..........................................................61

IV.    Addo, Botts, and Rayford Have Offered Insufficient Evidence That The District Of Columbia Subjected Them To A Hostile Work Environment Due To Race.......................................................63

    A.    The employees have not shown that the hostility they allegedly encountered was caused by a policy or practice of the District of Columbia. .....................................................63

    B.    Alternatively, none of the employees have offered sufficient evidence of a race-based hostile work environment. ............................................................................64

        1.    Addo has offered only conclusory evidence that he endured more than a few isolated instances of hostility or that this hostility was substantially motivated by race............................................................64

        2.    Botts has not shown that he suffered severe and pervasive race-based hostility.........................................67

iv

C.     Rayford has not shown that he suffered any workplace hostility, much less that it was based on race. ..........................70

CONCLUSION ....................................................................................................71

# TABLE OF AUTHORITIES*

*Cases*

*2922 Sherman Ave. Tenants Ass'n v. District of Columbia*,
444 F.3d 673 (D.C. Cir. 2006) ..............................................................35

*Abuelyaman v. Ill. State Univ.*, 667 F.3d 800 (7th Cir. 2011) ................................39

*Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854 (7th Cir. 2008) ................41, 51

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)..............................................30, 31

*Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir. 1990) ...........................65, 66, 67

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................35

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) ...................................68

*Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011) ..........................................30, 70

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) ............................55

*Bowyer v. District of Columbia*, 793 F.3d 49 (D.C. Cir. 2015)..............................62

*\*Brady v. Office of the Sergeant of Arms*,
520 F.3d 490 (D.C. Cir. 2008) ..................................................................36, 37, 49

*Brooks v. Grundmann*, 748 F.3d 1273 (D.C. Cir. 2014) ..................................63, 70

*Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999)..............................................47, 52

*Bryan Cty. v. Brown*, 520 U.S. 397 (1997)......................................................54, 55

*Burke v. Gould*, 286 F.3d 513 (D.C. Cir. 2002).....................................................67

*Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290 (D.C. Cir. 2015) ..................27

*\*Carter v. District of Columbia*, 795 F.2d 116 (D.C. Cir. 1986) ..........54, 55, 56, 64

---

*     Authorities upon which we chiefly rely are marked with asterisks.

*City of Canton v. Harris*, 489 U.S. 378 (1989)..................................................54, 55

*Connick v. Thompson*, 131 S. Ct. 1350 (2011).........................................................53

*Conward v. Cambridge Sch. Comm.*, 171 F.3d 12 (1st Cir. 1999)..........................46

*Daskalea v. District of Columbia*, 227 F.3d 433 (2000) ........................................54

*Douglas v. Donavan*, 559 F.3d 549 (D.C. Cir. 2009)..............................................30

*Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (M.S.P.B. 1981) ................................3

*EEOC v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003) ................................................46

*Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823 (7th Cir. 2008) ...........................47

*George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005)............................................64, 68

*Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670 (7th Cir. 2012) .......................39, 42

*Hairston v. Vance-Cooks*, 773 F.3d 266 (D.C. Cir. 2014) .....................................38

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993)..............................................................68

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977)..................................37

*Hernandez v. Pritzker*, 741 F.3d 129 (D.C. Cir. 2013)....................................45, 61

*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999)...................................................38

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ................................................67

*\*Hollins v. Fannie Mae*, 760 A.2d 563, 578 (D.C. 2000) ........ 39, 40, 42, 43, 45, 50

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984)...................................................63

*Hudson v. Chi. Trans. Auth.*, 375 F.3d 552 (7th Cir. 2004) ...................................40

*Huff v. Sheehan*, 493 F.3d 893 (7th Cir. 2007).......................................................65

*Johnson v. Perez*, 823 F.3d 701 (D.C. Cir. 2016)...................................................36

*Keyes v. District of Columbia*, 372 F.3d 434 (D.C. Cir. 2004) ...............................48

*Krodel v. Young*, 748 F.2d 701 (D.C. Cir. 1984)......................................................38

*Lively v. Flexible Packaging Ass'n*, 830 A.2d 874 (D.C. 2003) ..............63, 65, 69

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .................................................31

*Lynn v. Deaconess Medical Ctr.-W. Campus*, 160 F.3d 484 (8th Cir. 1998).........46

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ................................................35

*Monell v. Department of Social Services*,
436 U.S. 658 (1978).......................................................26, 53, 54, 60, 63

*Montgomery v. Chao*, 546 F.3d 703 (D.C. 2008) ..............................................40, 42

*Neuren v. Adduci, Mastriani, Meeks & Schill*,
43 F.3d 1507 (D.C. Cir. 1995) .......................................................38, 66

*Okla. City v. Tuttle*, 471 U.S. 808 (1985) ...........................................56, 60, 63, 64

*Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988)........................ 55-56

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ...............................................53

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ....................................36

*Potter v. District of Columbia*, 558 F.3d 542 (D.C. Cir. 2009)...............................46

*Reynolds v. Barrett*, 685 F.3d 193 (2d Cir. 2012) ...................................................35

*Rogala v. District of Columbia*, 161 F.3d 44 (D.C. Cir. 1998) ...............................54

*Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137 (D.C. Cir. 2008)...............38

*Schultz v. Navy*, 810 F.2d 1133 (Fed. Cir. 1987)....................................................48

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .........................................................54

*Stewart v. Evans*, 275 F.3d 1126 (D.C. Cir. 2002) ...........................65, 66, 67, 68

*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011)....................................................37

*Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997)....................54, 55

*Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211 (10th Cir. 1998)..........66

*Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245 (D.C. Cir. 2011)...........................36

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)...35, 38

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)...............................55

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) .........................................35

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003)...........58

### Constitutional Provisions

U.S. Const. Amend. V, Equal Protection Clause....................................................35

### Statutes and Regulations

42 U.S.C. § 1983 ................................................. 1, 26, 32, 33, 35, 53, 54, 55, 63, 65

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.........26, 34, 35, 65, 68

### Other

Fed. R. Civ. P. 56(c)...............................................................................................31

## GLOSSARY

| | |
|---|---|
| AddoBr. | Brief of Charles Addo |
| BurtonBr. | Brief of Gerald Burton |
| EMS | Emergency Medical Services |
| EMT | Emergency Medical Technician |
| NelsonBr. | Brief of Wayne Nelson |
| NREMT | National Registry of Emergency Medical Technicians |
| Pls.Br. | Brief of Daniel Botts, Charles Florence, and Charles Rayford |
| RD | ECF Record Document |

## STATEMENT OF THE ISSUES

The district court granted summary judgment to the District of Columbia on individual claims of race discrimination, under several theories of liability, brought by African-American current and former employees of the District's Department of Fire and Emergency Services ("Department").  The issues on appeal are:

1.  Whether the District is entitled to judgment as a matter of law on the claims arising out of the discipline of four employees, where they concede that they engaged in the misconduct underlying the discipline and they offer no admissible evidence that similarly situated Caucasian employees were treated more favorably.

2.  Whether the District is entitled to judgment as a matter of law on the claim arising out of alleged discrimination in the administration of a promotional examination in 2010, where: (a) the claim is brought under 42 U.S.C. § 1983, but the employee offers no evidence that the alleged irregularities were caused by a municipal policy or practice; and (2) alternatively, there is no evidence that the Department tampered with the employees' scores so that Caucasian test-takers would be ranked higher on the promotional list.

3.  Whether the District is entitled to judgment as a matter of law on the claim that the Department required only African-American fire inspectors to be certified as emergency medical technicians, where: (a) again, the employee offers

no evidence that the alleged exemption for Caucasian inspectors was caused by a municipal policy or practice; and (b) alternatively, there is no admissible evidence that any Caucasian inspectors were exempt from the requirement.

4. Whether the District is entitled to judgment as a matter of law on the hostile work environment claims of two employees, where: (a) again, the employees offer no evidence that the alleged hostility was caused by a municipal policy or practice; and (b) alternatively, the employees offer insufficient evidence that they suffered a hostile work environment based on race.

## STATEMENT OF THE CASE

Forty-four African-American current and former Department employees brought suit against the District, raising individual claims of race discrimination under several theories of liability. Following four years of discovery, nineteen plaintiffs remained, and the district court entered summary judgment in favor of the District on all claims. Seven noted appeals, but only six present argument in the opening briefs.

Making all reasonable inferences in favor of the employees, the record establishes the following facts:

## 1. The Department Disciplines Four Employees.

Plaintiffs asked the district court to consider the individual claims against a backdrop of disproportionate discipline of African-American employees. In

2

October 2007, the Committee on Public Safety for the Council of the District of Columbia asked the Department to respond to allegations of "disparate handling of discipline based on race." Pl.Ex.31at1. In February 2008, the Department responded with a spreadsheet detailing the racial makeup of its employees and a breakdown of disciplinary actions by race in Fiscal Years 2005 through 2007. Pl.Ex.31. The spreadsheets showed that African-American employees had been subject to disproportionate discipline. Pl.Ex.31at4-7. This disparity may have continued over the next four years.[1] *See* ThomasEx.Z. It is undisputed, however, that the District's liability for any individual claim depended on a showing that the particular individual suffered discrimination.

### A. Lieutenant Charles Addo is suspended twice for missing three medical appointments.

Employees injured in the performance of duty are entitled to treatment, free of charge, from the Police and Fire Clinic, and if they cannot work they are placed

---

[1]     The employees do not support their claim that "African-Americans were placed on charges beyond 75 days from the date the Department became aware of the alleged infraction, despite [collective bargaining act] restrictions"—the deposition testimony they cite is not related to this allegation. Pl. Br. 7 (citing Pl.Ex.8at10-17). They also do not support the claim that "the Department properly applies the Douglas Factors when seeking to discipline Caucasians, but not when seeking to discipline African-Americans"—the documents they cite do not suggest as much. *See* Pl. Br. 7 (citing Pl.Ex.20at 140 (testimony describing disciplinary process); Pl.Ex.21 (testimony regarding promotional exam); Pl.Ex.22at17 (testimony that Fire Chief approves discipline); Pl.Ex.60 (list of Douglas Factors, drawn from *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (M.S.P.B. 1981)); and Pl.Ex.103 (report of employee charged with domestic abuse)).

on administrative sick leave, which is not subtracted from their accrued sick leave. *See* AddoEx.B, Ex.9. The Department, however, requires employees to keep scheduled Clinic appointments, to promote the smooth functioning of the system. Thus, an employee on administrative sick leave "who fails to report for a scheduled appointment … will be carried on his/her own Sick Leave beginning at the time of the missed appointment and continuing until they report as properly rescheduled," and "[a]ll employees who miss appointments … will be charged with the appropriate violations." AddoEx.B, Ex.9at3.

In October 2009, Lieutenant Charles Addo suffered a work-related shoulder injury, and in April 2010, he underwent surgery to treat it. AddoEx.Bat74. He was still on administrative sick leave when he missed a Clinic appointment on June 11, 2010. D.C.ReplyEx.D. The Department issued a 12-hour suspension for his misconduct, noting that it was his "5th neglect of duty type charge within 36 months." D.C.ReplyEx.D; AddoEx.Bat92-93. Two weeks later, he missed another Clinic appointment—he testified that he arrived too late to be seen. AddoEx.B, Ex.10. A month later, he missed yet another appointment. AddoEx.B, Ex.10. The Department proposed an 84-hour suspension, which was reduced to 24 hours. AddoEx.B, Ex.10; AddoEx.F.

Addo admits that he missed the three appointments, but claims that similarly situated Caucasian employees were treated more favorably. Addo Br. 12-14. In

4

2008, a Battalion Fire Chief, L.A. (identified here by his initials), was charged with insubordination for failing to schedule annual physicals for six years, from June 2001 through June 2007.  AddoEx.I.  He accepted a 300-hour suspension to resolve the matter.  AddoEx.I.  The same year, Captain W.M. was charged with misconduct for failing to schedule his annual physical for seven years; he too was suspended for 300 hours.  AddoEx.H.  And several other Caucasian employees were reprimanded for missing clinic appointments.  AnthonyWilliamsEx.Lat3-6.  The record does not reflect these employees' greater disciplinary histories.  *See id.*; RayfordEx.B (listing infractions and penalties).

### B.    Lieutenant Gerald Burton is suspended for violating direct orders and failing to follow standard operating guidelines.

In November 2007, Lieutenant Gerald Burton and his crew were operating an out-of-service fire engine, on their way to a drill at a local school, when they heard a radio call of a house fire ten blocks away.  BurtonEx.Cat2.  Five fire engines and six other units were dispatched to the scene.  BurtonEx.Cat2.  Burton radioed Battalion Fire Chief Michael Reilley and requested permission to respond as well.  BurtonEx.Cat2; Pl.Ex.1at64.  Reilley ordered him to "disregard and not to respond."  BurtonEx.Oat2.

Burton disobeyed this order and responded to the scene.  BurtonEx.C, BatesNo.111799.  His engine was the first to arrive.  BurtonEx.Aat30.  There was a man on the front porch, "thick, heavy smoke" was "coming out the front door,"

5

and Burton could "see a little fire in there." BurtonEx.Aat30. He radioed Chief Reilley again, saying, "We are on the scene, what is your pleasure." BurtonEx.Aat30. Reilley ordered Burton's engine to "take third due," a position that backs up "first due" by "us[ing] its pump to increase the hydrant's water pressure" so that "first due" can extinguish the fire. BurtonEx.Aat30; BurtonEx.Bat1. The "first due" engine was not yet there and, Burton testified, it was "unheard of" to ask an engine to take a third-due position for an engine that was not yet on the scene. BurtonEx.Aat30; Pl.Ex.1at251. He did not explain this to Reilley, because they were having "radio problems." Pl.Ex.1at50. Instead, he and another firefighter "proceeded to go inside the burning house, without backup, using the hose connected directly to their engine's water tank. BurtonEx.Aat30.

In his after-action report, Chief Reilley reported that "Burton's actions created an extremely dangerous situation." Pl.Ex.43 (altered to lower-case). When Burton responded despite being ordered to disregard, Reilley "was forced to reassign a company that was committed to the front of the fire building," which complicated his coordination of the fire scene. Pl.Ex.43. Reilley also reported that Burton "did not lay out [the hose] as [he] advised," and had to be supplied with water from another fire truck. Pl.Ex.43. He concluded: "We could have [had] numerous firefighters hurt if not for the quick actions" of a different engine crew. Pl.Ex.43.

6

Reilley recommended that Burton be disciplined for several violations of Department policy.    Pl.Ex.47 at 2-3; *see* Pl.Ex.1at110; BurtonEx.Cat2-3; BurtonEx.I.    A trial board found him guilty of disobeying a direct order. BurtonEx.G, BatesNo.111799.  It recommended a 120-hour suspension, noting that this "is a serious infraction" and that, because Burton had been "told directly to 'disregard,'" his "decision to drive to the scene [wa]s a deliberate violation." BurtonEx.G, BatesNo.111799.   Moreover, the board explained, it imposed this "enhanced penalty" because Burton had "steadfastly refused to accept responsibility for his inappropriate actions and continues to aggressively assert that he did nothing wrong."  BurtonEx.G, BatesNo.111799-800.

The board also found Burton guilty of failing to lay out the hose as standard operating procedure required, and recommended a 60-hour suspension for this infraction.  BurtonEx.G, BatesNo.111800-802.  "Safe firefighting practices require that an engine company attacking a fire have a continuous water supply.  This is accomplished by laying a supply line from a hydrant or coordinating with the incident commander or other engine company for a reverse or split lay." BurtonEx.G, BatesNo.111801.  "Burton clearly should have laid a supply line from a hydrant before entering the block and committing his company without a water supply."  BurtonEx.G, BatesNo.111801.  "Failing to secure a water supply and forcing the reorganization of the fireground created an unnecessarily dangerous

7

situation." BurtonEx.G, BatesNo.111801. Moreover, the board noted, "this incident became public through the efforts of the defendant and his counsel and reflects poorly on the Department." BurtonEx.G, BatesNo.111802. The Department later reduced the recommended total 180-hour suspension to 72 hours. Burton Ex.J.

Burton admits that he violated a direct order in responding to the fire, but claims that similarly situated Caucasian employees were treated more favorably in similar circumstances. In April 2010, Sergeant K.A.'s fire engine was responding to an alarm as "5th due" when he "came across a large column of smoke." Pl.Ex.33. He advised his supervisor "to remove [him] from" the previous assignment so he could investigate the source of the smoke. Pl.Ex.33. He found and extinguished a fire coming from a large pile of discarded furniture burning on a house porch. Pl.Ex.33. He was counseled for his failure to notify his supervisor in a timely manner, but was not otherwise disciplined.[2] Pl.Ex.33.

---

[2]      Burton abandons reliance on another comparator he proffered below. He testified that, around the same time as his incident, a Caucasian Lieutenant was not penalized even though he reported to a fire without being dispatched—he "just said, I'm on the scene" even though his vehicle locator indicated he was "over a mile away." BurtonEx.Aat158-59. Burton did not know whether the Lieutenant had been ordered not to respond. BurtonEx.Aat159. He admitted that he had no personal knowledge to support this claim—"[s]omeone just gave [him] the information." BurtonEx.Aat158.

Burton testified that he was not allowed to work overtime while he was suspended, but that J.F., a Caucasian firefighter, did work overtime while suspended. BurtonEx.Aat155; Pl.Ex.1at232. But he admitted that his testimony was not based on personal knowledge—it was "brought to his attention" by someone else. BurtonEx.Aat155. J.F.'s time-and-attendance records in fact show no overtime pay during two weeks he served his suspension. Pl.Ex.28.

### C. Lieutenant Charles Florence resigns after a trial board finds him guilty of sexual harassment and recommends a demotion and suspension.

In April 2009, Sergeant K.C. filed a sexual harassment complaint against Lieutenant Charles Florence, alleging that he physically intimidated her and refused to allow her to leave her desk space, even after she had asked him four times to step away so she could leave. FlorenceEx.A, BatesNo.104227. She also alleged four previous instances of inappropriate conduct: (1) in the summer of 2007, he asked her, "would you mind dating me and from time to time you letting me fondle you and squeeze your teeties and butt because that's all I can do since I suffer from erectile dysfunction due to my medical condition"; (2) in June 2008, he said in a "sexually suggestive" tone that he had been detailed to the Training Academy "to just sit and watch [her]"; (3) in August 2008, while riding next to her, he "took his hand and rubbed [her] from [her] shoulders down to [her] lower back near [her] behind" and, when she "ordered him not to touch [her] again," he

9

"rub[ed] [her] on [her] right thigh" until she stabbed him in the hand with her keys; and (4) in October 2008, he told her that if she "d[idn't] feel like going out with [her] girl friend, just tell her you're going home to get some DICK." FlorenceEx.A, BatesNo.104228.

During the Department investigation, another female member alleged that Florence had been harassing her during her entire 21-year career. FlorenceEx.A, BatesNo.104240. She reported that he "would frequently make reference to her breasts," "[o]n one occasion he bit her," "[h]e pulled her hair," and he said "[y]ou won't let me eat your pussy and pay your bills." *Id.* He "would tell her, 'If you let me touch your breasts, I will give you 100 on your test.'" *Id.* When she was sitting at the watch desk, she "would be able to see [him] masturbating in the office." *Id.* He "would intimidate her by standing too close, especially when she was seated—putting his crotch at eye level." *Id.*

> On another occasion, [he] brushed up against or caressed her butt. She was furious, but when she called him on it, he told her that he couldn't help it. She told him not to touch her again. After that he began talking trash every tour. He would make comments about her physique when she had to bend over. His behavior got worse over time.

*Id.*

The Department charged Florence with several counts of sexual harassment against K.C. FlorenceEx.B. A trial board found him guilty of making sexually suggestive remarks to her in October 2008, but not guilty of inappropriate touching

10

or intimidating conduct.  FlorenceEx.B.  It proposed that he be demoted to the rank of sergeant and suspended for 168 hours.  FlorenceEx.B.

Assistant Chief Brian Lee told Florence about the trial board's decision before it issued.  FlorenceEx.Cat26.  Florence had the option to appeal to the Fire Chief, who could have overruled the decision.  FlorenceEx.Eat43-44.  In addition, Florence testified that Lee gave him "several options"—"I was told that I would be demoted; I would lose money; I was told that I could retire; I was told that I would be suspended and that I would possibly be labeled as a sexual harasser." FlorenceEx.Cat26; *see* Pl.Ex.2at40, 63-64.  He did not understand Lee to be threatening to label him a sexual harasser, but he knew that members would figure that out from his demotion. FlorenceEx.Cat28-29.   Florence chose to retire. FlorenceEx.Cat45; Pl.Ex.36.

Florence does not deny that he engaged in the misconduct.  Instead, he claims that the trial board's proposed penalty was harsher than what it proposed for a Caucasian employee who engaged in similar misconduct.  Pls. Br. 42-48.  In May 2007, Lieutenant J.C. "sent a photograph of his penis" to a female firefighter's mobile phone via text message.  FlorenceEx.Hat1.  A trial board found him guilty of sexual harassment and recommended that he be demoted to the rank of captain. FlorenceEx.H.  He also was suspended for 168 hours for a second harassment-related charge.  FlorenceEx.H

11

**D.     Firefighter Charles Rayford is suspended for unsafe driving and misleading his supervisor; he later is terminated for multiple failed drug tests.**

In July 2007, Firefighter Charles Rayford was involved in a minor collision while driving a fire engine. RayfordEx.A42. He did not have his driver's license with him. RayfordEx.C, BatesNo.77421. Earlier that morning, when his supervisor had conducted the "daily lineup" "to ensure that each member had a valid motor vehicle license on his or her person," Rayford had flashed his *non-driver's* personal identification card, which largely "looks similar" to a driver's license. RayfordEx.C, BatesNo.77418, 77421-22 (altered to lower-case). He showed the same card to a police officer at the scene of the accident, and although the officer did not mistake it for a driver's license, he was able to confirm that Rayford was properly licensed. RayfordEx.C, BatesNo.77421.

A trial board found Rayford guilty of two infractions: (1) driving at excessive speed on wet roads and causing "moderate damage" to a parked car; and (2) misleading his supervisor into believing he had his driver's license on him when he did not. RayfordEx.C, BatesNo.77417-18. He was suspended for 48 hours for the first infraction—the trial board explained that this "enhanced penalty" was based on a "prior record of misconduct."[3] RayfordEx.C, BatesNo.77420. He was suspended an additional 48 hours for the second infraction—again, the trial

---

[3]     Rayford does not dispute this characterization of his disciplinary record.

12

board found the "enhanced penalty" justified by his "disciplinary record for the past three years." RayfordEx.C, BatesNo.77422. Moreover, the trial board noted, this misconduct "could have resulted in extreme liability for the department." *Id.* "[E]ven absent the willful intent to conceal," "the fact that he presented a recognizable non driver's ID was improper and misleading." *Id.* "Because [he] had purposely obtained both a driver's license and non-driver ID from [the District of Columbia Department of Motor Vehicles], he should have known that he was presenting the wrong card and notified his officer so he could be assigned to a position other than wagon driver." *Id.*

Rayford claims that similarly situated Caucasian employees were treated more favorably. Pls. Br. 49-51. He argues that Firefighter D.S. only "received reprimands" for "more than one minor motor vehicle accident," and received only "counseling for not having a driver's license." Pls. Br. 20 (citing RayfordEx.B, Case No. U-07-218).[4] The record, however, establishes that D.S. was charged only with "unsafe driving." AnthonyWilliamsEx.L, BatesNo.42396. Rayford also

---

[4]    Rayford primarily cites RayfordEx.B as evidence of other charges and penalties. Pl. Br. 20. That document, however, is nearly impossible to interpret because it breaks the data across several pages without any identifying references. The first page lists case numbers along with employee names, ranks, and races; the second page lists infractions; the third lists types of penalties; and the fourth provides additional details. These lists do not appear to line up into a cohesive chart. Because much (if not all) of the same information is contained in AnthonyWilliamsEx.L, the District relies on that document instead.

testified, based on hearsay, that six other Caucasian firefighters committed similar infractions, "some of them even more egregious where it was major damage to a[n] automobile," and "either they didn't get any [suspension] at all or they got anywhere from 12 to 24 hours." RayfordEx.Aat43-45. The record confirms that, in 2007, six Caucasian employees were either counseled or reprimanded for "minor motor vehicle accident[s]." AnthonyWilliamsEx.L, BatesNo.42395-96. That same year, eleven African-American employees were likewise counseled or reprimanded for minor motor vehicle accidents. *Id.* None of these employees were charged with failing to carry their drivers' license at the time, and none appear to have misled their supervisors into believing they were carrying their license when they were not.[5] *Id.*

Under the Department's substance-abuse policy, employees who are required to undergo annual physical examinations must submit to annual drug testing. RayfordEx.Dat6. Those who test positive are automatically enrolled in the Department's substance-abuse program, which provides rehabilitation, counseling, and weekly drug testing. RayfordEx.Dat15-17. An employee who tests positive

---

[5]    Rayford identifies two other comparators that are unsupported by the record. Pl. Br. 20 (citing RayfordEx.B, Case Nos. "U-08-020" and "U-09-166"). In Case No. U-08-020, the employee was charged with "domestic abuse." AnthonyWilliamsEx.L, BatesNo. 42372. And Case No. U-09-166 does not appear in any of the charts listing disciplinary actions. *See* RayfordEx.B; AnthonyWilliamsEx.L, M.

14

after testing negative" during the year-long program "will be recommended for termination." RayfordEx.Dat18.

In 2008, Rayford tested positive for marijuana and was enrolled in the program. Pls. Br. 20-21.[6] He tested negative from September 2008 through January 2009, but, in February 2009, he again tested positive for marijuana. RayfordEx.E, BatesNo.106952; RayfordEx.Aat57. The Department splits the urinalysis samples so a member can request a confirmation test from an independent, federally certified laboratory, but Rayford did not ask for independent testing. RayfordEx.Dat10; RayfordEx.Aat57-58. Instead, "24 to 48 hours" after he was informed of his positive drug test (the record does not reflect when he was informed), he "went to a clinic and got … [his] own toxicology test" which, he testified, was negative. RayfordEx.A58. He did not know whether the clinic used a federal-government-approved laboratory, and he did not introduce the test results into the record. RayfordEx.A58-59.

The Department charged Rayford with testing positive for a controlled substance while in the substance-abuse program, a terminable offense. RayfordEx.E, BatesNo.106952-53. It also charged him with tampering with urine samples—he had submitted several samples that did not meet the Department's

---

[6]     Rayford cites pages 54-56 of his deposition, which are not in the summary judgment record. These facts, however, are undisputed.

criteria for testing—which was also grounds for automatic termination.  RD 202-15; RayfordEx.E, BatesNo.106953; *see* RayfordEx.Aat59-60.  The trial board found him guilty of both charges.  RayfordEx.E, BatesNo.106954.  He resigned in lieu of termination in November 2009.  RayfordEx.H.

Rayford claims that four Caucasian employees were not required to enter the substance-abuse program for their first offense, and therefore were not subject to automatic termination if they committed a second offense.  RayfordEx.Aat18-19, 27.  Rayford testified, based on hearsay, that Lieutenant K.B. was not enrolled in the program after he tested positive for illegal drugs.  RayfordEx.A25.  But the record shows that K.B. *was* enrolled in the program.  RayfordEx.I-J.  And while this was K.B.'s second violation of the substance-abuse policy, the record contains no details as to the date or nature of K.B.'s first violation.

Rayford also testified, based on hearsay, that Firefighter J.F. and Firefighter/Paramedic M.D. were not enrolled in the program after they were charged with alcohol-related driving offenses.  RayfordEx.Aat25.  The record shows that these comparators were so charged, but does not indicate whether they were enrolled in the substance-abuse program.  RayfordEx.K-L; Pl.Ex.30.  Nor does the record indicate whether the comparators tested higher than .020 on a "properly used, calibrated, inspected, and maintained breathalyzer," which is required to violate the substance-abuse policy.  RayfordEx.Dat3, 12.

16

Finally, Rayford testified, based on hearsay, that Sergeant Aide D.G. was not placed in the program even after he stole drugs "from behind a pharmacy counter." RayfordEx.Aat30. The record shows that D.G. was caught shoplifting over-the-counter drugs; there is no evidence he was charged with substance abuse. RayfordEx.F; *see* Pls. Br. 22.

## 2. During The 2010 Promotional Examination, All Candidates, Including Firefighter Wayne Nelson, Are Instructed To Write Their Names On Their Tests.

Every two years, the Department conducts a promotional exam, which includes 100 multiple-choice questions, an administrative writing exercise, an oral interview, and a tactical exercise where candidates verbally respond to hypothetical emergencies. NelsonEx.A, Ex.4. Final qualifying scores are ranked and promotions are made from the top of the list as positions become available. NelsonEx.A, Ex.4.

Firefighter Wayne Nelson took the lieutenant's exam in 2010. NelsonEx.Aat44. He testified that, at some point during the exam, candidates "were told to write [their] names on [their] test[s]." NelsonEx.Aat15. He testified that this was done to "identif[y] the white members that the agency wanted to [promote]," although he admitted that he had no personal knowledge that the Department—rather than the independent contractor it hired to craft and administer the exam—graded the tests and calculated the scores. NelsonEx.Aat15, 25-29. As

17

evidence of this supposed bias, he testified that the promotional lists were "top heavy [with] white people and the African Americans were at the bottom of the list." NelsonEx.Aat32. He admitted, however, that there was "only a two-point difference in [his] score between 2008 and 2010," and that his 2008 ranking (32nd out of 36 candidates) was not "significant[ly] differen[t]" from his 2010 ranking (96th out of 104). NelsonEx.Aat36, 42; *compare* NelsonEx.A, Ex.6, BatesNo.48694 *with* NelsonEx.A, Ex.8, BatesNo.48747; *see* NelsonEx.A, Ex.7, Ex.9. And he admitted that the one part of the test where he scored significantly lower in 2010 was the section where he "did not have to identify [him]self by name." NelsonEx.Aat61.

Nelson also based his allegations of racial bias on the fact that Captain R.L., who was sequestered from other employees while assigned to the subject matter expert panel for the promotional exam, "had contact with [a white employee] at the 2010 Marine Corps Historic Half Marathon." NelsonEx.Aat63. R.L. admitted to this and other violations of his sequester. Pl.Ex.65. The Department conducted a formal investigation and "removed [him] from the subject matter expert panel significantly before the 2010 promotional exam was written." NelsonEx.Fat2. "At the time he was removed," R.L. "had no access to the contractors['] exam materials. While [his] unapproved contact with his subordinate was inappropriate, it did not affect the 2010 promotional examination." NelsonEx.Fat2.

18

**3.      The Department Requires All Employees, Including Fire Inspector Daniel Botts, To Be Certified As Emergency Medical Technicians.**

In 1987, the Department began requiring all firefighters to maintain a valid Emergency Medical Technician ("EMT") card. BottsEx.Dat2. Firefighters hired before 1987, however, could not be terminated for not having a valid EMT card. BottsEx.Dat2.

In 2009, the Council codified this requirement, enacting a law that "no person shall perform the duties of emergency medical services personnel in the District, whether for compensation or not for compensation, without first having obtained a certification from the Mayor to do so." D.C. Code § 7-2341.05. That same year, the District of Columbia Department of Health adopted the standards for EMT certification from the National Registry of Emergency Medical Technicians ("NREMT"). BottsEx.Dat3. Thus, "[a]s of July 1, 2009, all uniformed and civilian [emergency medical services ('EMS')] providers with the Department, regardless of their date of hire, are required to present a valid [NREMT] card in order to receive a DC EMS certification card." BottsEx.Dat3. The Department required "all employees" to become certified, and those who were not already NREMT certified "were required to attend an NREMT certification course." BottsEx.Hat5. This requirement applied to firefighters and fire inspectors as well as EMTs. *See* Pl.Ex.23-25 (listing training and certification status of employees). None were exempt. BottsEx.Fat1-2.

19

Daniel Botts was hired as a firefighter before 1987, but he maintained an EMT certification until it expired in January 2009.  BottsEx.J.  Because he had been promoted to Fire Inspector and no longer provided medical treatment, he let his certification lapse.  BottsEx.A69.  He testified that the Department had determined that it "wasn't necessary" for him to have an EMT card, although it is not clear whether this testimony refers to his status before the new policy was adopted in 2009.  BottsEx.Aat76.

Later that year, Botts was transferred to the Department Training Academy to attend his NREMT certification course.  BottsEx.A58.  He took the EMT test several times, but did not pass.  AntoineWilliamsEx.T, BatesNo.123064, 123074, 123079.  As a result, he continued to be detailed to the Training Academy—where he was ineligible for overtime and holiday pay.  BottsEx.Dat3.

Botts "does not contest the value of the NREMT training generally," but claims that the Department "requir[ed] him, but not Caucasian Fire Inspectors, to take and pass this training."  Pls. Br. 38.  He based this belief on hearsay.  A Department chief "told [him] that … a lot of white guys" were not required to attend the Training Academy.  BottsEx.Aat78.  He "was told" by a sergeant that "75 to 100 white firefighters" hired before 1987 were excused.  BottsEx.Aat78-79.  Another firefighter whose certification had expired told Botts that, if required to attend the training, he would skip the Department's "barbecue cookoff," "[s]o …

he didn't have to go." BottsEx.Aat77. Botts also attested that "one of the A[.] brothers" was not required to attend, but he offered no evidence that this was based on personal knowledge supporting this claim. BottsEx.Bat13.

The record does not reflect how long Botts remained at the Training Academy or whether he ultimately obtained his EMT certification.

## 4.     Addo and Botts Encounter Workplace Hostility That They Believe Is Based On Race.

### A.     Addo's performance is criticized by two successive supervisors.

In late 2007, Addo was transferred to Truck 10, where he was supervised by Battalion Fire Chief Sean Greene. AddoEx.B19. Addo testified that, soon after his transfer, Greene "started to negatively look toward [him] as a black officer." AddoEx.Bat20. Greene "was constantly trying to discredit," "demean," and "belittle" him. AddoEx.Bat20-21. Addo testified that "he [would] constantly haggle me about little things." AddoEx.Bat20. "[H]e just kept trying to find and put me on charges for something." AddoEx.Bat38.

Addo testified at length about Greene's alleged hostility toward him, but he provided few examples. *See* AddoEx.Bat20-31. In January 2009, Greene asked Addo to e-mail reports on drills completed by a probationary firefighter. AddoEx.Bat29-30. Addo testified that, on one occasion, "the computer wasn't working" and the e-mail would not send. AddoEx.Bat33. He tried to call Greene to see if he needed it that night, but Greene "could not be contacted," so Addo put

21

the e-mail "in the mail." AddoEx.Bat33. As a result of this incident, Addo was reprimanded. AddoEx.Bat38; AddoEx.B, Ex.5. On another occasion, Greene reprimanded Addo for failing to "give a proper size-up" after an incident. AddoEx.Bat57-58. Addo testified that, even if this was accurate, it was a "very minute" error—"they were just finding little things that they can charge me with because, you know, I was being targeted." AddoEx.Bat60. He also described one instance when he used his radio to tell dispatch where his unit was responding, "and then afterwards, he would say, you know, I didn't hear your response." CAEx.Bat22. And once, after he accused Greene of "nit-picking" because Addo was "a black officer," Greene responded that Addo should "just retire if you don't like what I'm doing to you." AddoEx.Bat28.

Addo testified repeatedly that Greene was hostile because Addo was African-American. AddoEx.Bat23-29, 34, 43, 45-51. "[Y]ou could see this pattern, that once he got there to make chief, he was taking on … black officers." AddoEx.Bat22. Addo believed that Greene wanted him "out of … that house," and was manufacturing reasons to transfer him. AddoEx.Bat23. Addo explained that Truck 10 was a "black house," meaning it had "more black members" than Caucasian, and Greene "figured if he could get the black officers out of there" he could "change the make[up] of that house." AddoEx.Bat26.

22

Addo offered no evidence that Greene ever talked about such a plan, and he admitted that Greene never used racial slurs. AddoEx.Bat21. But Addo "saw it in his ways" and "with his eyes." AddoEx.Bat27, 47. Moreover, Addo testified, Greene did not treat the Caucasian sergeant in the house the same way. AddoEx.Bat43.

In 2010, Addo transferred to Engine 5 because he "just wanted to get away from" Greene. AddoEx.Bat47, 50. But he had "[v]ery similar" problems with his new supervisor, Battalion Chief Lawrence DiPietro. AddoEx.Bat52, 54. "[F]rom day one, he had that look on his face … because I replaced the white officer." AddoEx.Bat53. DiPietro did not use any racially charged language, but his animus, according to Addo, was in "[t]he way he looked at you." AddoEx.Bat55-56. "[H]e would come there and try to find little things … to make me look insubordinate or incompetent … ." AddoEx.Bat56.

Addo voluntarily retired in November 2012. AddoEx.B, DepEx.1. He claimed that he had "no choice but to retire in order to maintain [his] emotional health and prevent [his] supervisors from orchestrating an incident that could lead to [his] termination." AddoEx.Cat10.

### B. Botts overhears a supervisor using a racial slur, and encounters other workplace difficulties he believes are based on race.

Botts testified that "[t]here was a time" when he "could hear" a lieutenant who using a racial slur for African-Americans. Pl.Ex.3at37-38. And, on another

23

occasion, a newspaper reporter told Botts that, when she was in the back of the firehouse with Caucasian firefighters, "she continuously heard them" use the slur, and talk about "hat[ing]" African-Americans.[7]  Pl.Ex.3at38.

Botts testified that he was promoted to the rank of Inspector in 2004, but his pay increase was not processed until 2007.  BottsEx.A, Ex.9; BottsEx.Bat5.  He ultimately was given back pay, but he testified that it did not account for his overtime.  Pl.Ex.3at90.  He attested that a pay increase for another black firefighter was similarly delayed, while a pay increase for a white firefighter was processed within three weeks.  BottsEx.Bat7.  He admitted, however, that this was not based on personal knowledge.  BottsEx.Bat7.  He filed a discrimination complaint with the Department's Equal Employment Opportunity Program Manager, who explained that the delays had been caused by confusion over whether to back-date the promotion to the time they were detailed to the position.  BottsEx.C.  The white firefighter identified by Botts "went to [the Battalion Fire Chief] and personally asked for [his] assistance in resolving the payroll issue," but "[n]one of the [other] firefighters sought assistance in this matter."  BottsEx.C.  The Battalion Fire Chief told the investigator "that he was not made aware of the pay issues of the other

---

[7]     Botts claims the same slur was used "several other times," but the testimony he cites refers to these same incidents.  Pl. Br. 15 (citing Pl.Ex.3at15).

firefighters until it was bought to his attention on or about August 2006," when he took action to resolve the matter.  BottsEx.C.

Botts also testified to earlier incidents that he believed were based on racial animus.  In 2002 or 2003, someone put charred glass in his gear.  Pl.Ex.3at41-42. The Metropolitan Police Department investigated the incident but "couldn't find anything."  Pl.Ex.3at44; BottsEx.Aat45.   Someone also "keyed" his and other black firefighters' cars, but "none of the white firefighters[']" cars.  Pl.Ex.3at34; BottsEx.Aat45-46.   "Around the same time," someone broke into his car, and someone rummaged through his locker.  BottsEx.Aat46.  He believed he was harassed because of his race, vegetarianism, or religious beliefs, or because he was "really, really deep into … the study of UFOs."  BottsEx.Aat42-49.

### C.    Rayford is suspended and terminated.

Rayford also claims he suffered a hostile work environment.  Pls. Br. 64.  He bases this on his two claims of disparate discipline: his trial-board proceedings and suspension for a traffic accident and misleading actions regarding whether he was carrying his driver's license, and his enrollment in the substance-abuse program after he tested positive for marijuana.  RayfordEx.C, E.

### 5.    The District Court Enters Summary Judgment In Favor Of The District.

By the time the District moved for summary judgment, only 19 of the original 44 employees remained in the case.  ECF Record Document ("RD") 224 at

1.  Those who had exhausted their administrative remedies brought discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; the rest brought discrimination claims under 42 U.S.C. § 1983.  RD 224 at 4.

The district court granted the District summary judgment because, despite "ample discovery," the employees relied on "anecdotal information," "hearsay," and "subjective impressions," and did not "raise a genuine factual issue" on any remaining claim.  RD 224 at 2-3, 8.  That was so even assuming the § 1983 claims were supported by the necessary showings that a municipal custom or practice caused the supposed violation, per *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  RD 224 at 64-65.  As to the six plaintiffs who still seek relief,[8] the court held:

*First*, Addo, Burton, Florence, and Rayford offered insufficient evidence that they suffered disparate discipline due to their race, where plaintiffs did "not contest that they committed the infractions for which they were disciplined," did "not identify any direct evidence of racial animus," and failed to make a circumstantial case of intentional discrimination by comparison "to purportedly similarly situated white firefighters."  RD 224 at 83-84.  Plaintiffs' broad-brush

---

[8]    The seventh appellant, Joshua Fuller, abandons all claims by not presenting any argument for relief.  *See* Pls. Br. 24 & n.4 (seeking relief for Botts, Florence, and Rayford but not Fuller).

attempt to show intentional discrimination through statistics failed because "plaintiffs must each point to competent record evidence that would allow a reasonable jury to conclude that he … in particular was subjected to discrimination." RD 224 at 86.  And plaintiffs had failed to provide enough details about any proposed comparator sufficient to "demonstrate that 'all of the relevant aspects of [their] employment situation[s] were nearly identical."  RD 224 at 89 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)).  Thus, Addo had not shown that he was penalized more severely than similarly situated employees who missed clinic appointments, RD 224 at 90-92; Burton, than similarly situated employees who disobeyed direct orders and violated standard operating procedures, RD 224 at 92-94; Florence, than similarly situated employees who committed sexual harassment, RD 224 at 96-97; and Rayford, than similarly situated employees who drove unsafely, misled supervisors, and failed multiple drug tests, RD 224 at 100-03.  The court also held that Florence had not shown an adverse employment action, in the absence of evidence that his retirement "was wrongfully coerced."  RD 224 at 94-96.

*Second*, Nelson offered insufficient evidence that the District discriminated against him in administering the 2010 promotional examination.  RD 224 at 71-

27

81.[9]  Plaintiffs presented no evidence that discriminatory intent underlay the decision to require "test takers to print their names (as opposed to employee numbers) on their examinations."  RD 224 at 76.  They failed to explain why this "ma[d]e a difference," and, in any event, there was "no evidence whatsoever that [tracing of test-takers' identities] occurred in order to advantage only white test-takers."  RD 224 at 76-77.  Nor was there a genuine issue relating to "the failure to cancel the 2010 examination following revelations that a sequestered employee assisting in the preparation of the examination contacted potential test-takers."  RD 224 at 77.  Plaintiffs relied only on their "unsubstantiated belief … that the sequestered employee had any access to the content of the 2010 examination, … in the face of unrefuted sworn testimony from a senior [Department] manager with personal knowledge" that the employee was removed before the material was "written and finalized."  RD 224 at 77-78.

As for statistics "purportedly demonstrating that the 2010 promotional lists included a disproportionate number of high-ranked white firefighters and low-ranked African American firefighters," plaintiffs' "characterization of these lists is incomplete."  RD 224 at 77-78.  Moreover, again, "evidence of a statistical

---

[9]     Appellant Addo raised a similar claim but abandons it on appeal.  Nelson abandons other claims about the timing of promotion from lists and the institution of a cut-off score on the 2008 examination.

disparity in applicant scores is insufficient to support their asserted inference that the lists were the product of intentional discrimination." RD 224 at 78. In the end, plaintiffs had not "demonstrate[d] that their non-promotion resulted from an elaborate scheme to alter the 2010 test results." RD 224 at 80.

*Third*, Botts offered insufficient evidence that the District discriminated against him by detailing him to the NREMT training academy, per Department policy and District law. RD 224 at 81-83. It was "difficult to comprehend how requiring public safety officials in the role of firefighters to obtain certification in basic life-saving skills constitutes an adverse employment action." RD 224 at 82. Assuming so, Botts and other plaintiffs introduced insufficient evidence that they were "*exempt* from either the generally applicable [Department] policy or D.C. law." RD 224 at 83. Hearsay and their "impressions and beliefs" that similarly situated Caucasian firefighters were exempted "cannot be reconciled with the documentary record evidence" showing NREMT compliance by "nearly all [Department] firefighters—of all races." RD 224 at 82-83.

*Fourth*, the court held that Addo, Botts, and Rayford offered insufficient evidence of a hostile work environment. RD 224 at 117-21.[10] Addo's complaints that "his supervisors had 'noticeably different' interactions with white

---

[10]    Burton and Florence abandon their hostile-work-environment claims on appeal.

subordinates" were insufficient.  RD 224 at 119-20.  Nor was it enough for Botts to cite "a single instance of a (presumably) white Lieutenant using racial slurs while [he] was 'in earshot,'" a "sheer hearsay" account that a reporter described "racist attitudes of white [Department] employees," and proposed discipline as to another African-American employee.  RD 224 at 120-21.  There was "no evidence that Botts himself was subjected to any unwelcome harassment" or "that these distinct instances constituted … more than an 'array of unrelated discriminatory … acts.'" RD 224 at 121 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1252 (D.C. Cir. 2011)). Finally, Rayford's hostile work environment claim failed because it relied on the rejected theory that he had suffered discrete acts of discrimination.  RD 224 at 117-18.

## STANDARD OF REVIEW

This Court reviews a summary judgment ruling *de novo* and can uphold it "on any ground that finds support in the record, particularly one raised before the district court." *Douglas v. Donavan*, 559 F.3d 549, 551 (D.C. Cir. 2009).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).  A fact is "material" if its resolution

30

might affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A conclusory allegation cannot defeat a motion for summary judgment, even if it appears in a sworn affidavit or declaration. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

## SUMMARY OF ARGUMENT

1. Four employees—Addo, Burton, Florence, and Rayford—claim that the Department disciplined them because of their race. They have failed, however, to create a genuine issue regarding the District's legitimate, nondiscriminatory reasons for disciplining them.

The employees do not dispute the District's evidence that they committed the underlying misconduct. Instead, they argue that similarly situated Caucasian employees were treated more favorably. To show pretext, however, the relevant aspects of the comparators employment must be nearly identical. Here, several critical factors distinguish the comparators from the employees. Addo and Burton's comparators are not the same rank. With only one exception, the

comparators did not commit the same infractions as the employees. And that exception (a firefighter who, like Rayford, tested positive for illegal drugs) was given the same treatment as Rayford. Moreover, while Addo and Rayford do not dispute their record of prior misconduct, they offer no evidence suggesting that their comparators had similar disciplinary histories. And still other critical flaws preclude an inference of pretext: Addo's comparators were given harsher penalties; Florence's comparator was disciplined by different decisionmakers; and Rayford's Caucasian comparators were treated the same as numerous African-Americans charged with the same infraction.

2. Nelson offered insufficient evidence that the District discriminated against him in its administration of the 2010 promotional examination. This § 1983 claim fails at the outset because he offers no evidence that the purported irregularities in the exam process were caused by a municipal policy or practice, as required under *Monell*.

Alternatively, Nelson's claim fails on the merits. He offers only speculation that it was the Department—rather than an independent contractor—that required candidates to write their names on their exam materials, graded the exams, and calculated the scores. Moreover, even assuming he could prove this, he offers only speculation that the Department actually tampered with the test results to improve the promotional ranking of Caucasian employees. And he does not even attempt to

32

refute the District's evidence that the integrity of the exam could not have been compromised by a team member's violation of the sequester rules.

3.  Botts offered insufficient evidence that the District discriminated against him by detailing him to the Training Academy.  He does not challenge the Department's racially neutral policy of requiring all employees, including fire inspectors, to maintain valid EMT certification.  Instead, he claims that the Department discriminated against him because it exempted Caucasian fire inspectors from the requirement.  He fails, however, to satisfy a critical threshold requirement for this § 1983 claim, because he offers no evidence that the allegedly discriminatory application of a race-neutral policy was caused by a municipal policy or custom.

Alternatively, Botts's claim fails on the merits.  He offers only inadmissible hearsay that Caucasian employees were not required to obtain EMT certification, and he does not refute the District's evidence that, by December 2010, nearly every Department employee had obtained the certification.

4.  Addo, Botts, and Rayford have offered insufficient evidence of a race-based hostile work environment.  Because the employees' claims again are brought under § 1983, they must prove that the alleged hostility was caused by a municipal policy or custom.  All they offer, however, is evidence suggesting racial disparity in official discipline—an entirely different type of claim.

33

Alternatively, the employees fail to offer evidence of severe or pervasive race-based hostility.  Addo testified at length about racial hostility of two supervisors, but his narrative too vague and conclusory to have probative value. He gives only four concrete examples of negative treatment over a three-year period by the first supervisor, and only one by the second.  And he offers nothing but speculation that this alleged mistreatment was based on race.

Botts's claim is likewise unsupported.  He identifies seven discrete incidents over a period of at least seven years, with no evidence connecting these events to the same antagonists.  Moreover, the record supports an inference of racial animus only for two of these events.  This evidence is not sufficient to demonstrate a workplace environment permeated with discriminatory intimidation, ridicule, and insult.

Rayford's hostile work environment claim simply re-asserts his two claims of disparate discipline.  He cannot refute the District's nondiscriminatory reasons for taking these actions, and even if he could, they do not amount severe or pervasive race-based hostility.

## ARGUMENT

### I.   The Employees Have Offered Insufficient Evidence That They Suffered Disparate Discipline On The Basis Of Race.

Only Burton has exhausted his administrative remedies under Title VII, so only he can maintain a claim under that statute.  RD 224 at 4.  The other plaintiffs'

discrimination claims are brought under 42 U.S.C. § 1983.  RD 224 at 4.  Unlike Title VII claims, plaintiffs' § 1983 discrimination claims rest on the Equal Protection Clause, which requires a showing of intentional discrimination.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *see 2922 Sherman Ave. Tenants Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006).  "Because neither a state nor a state official in his official capacity is a 'person' within the meaning of § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), the requisite discriminatory intent must be held by the state official in his individual capacity."  *Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012).  "Thus, liability for an Equal Protection Clause violation under § 1983 requires personal involvement by a defendant, who must act with discriminatory purpose."  *Id.*  And "'[p]urposeful discrimination requires more than 'intent as volition or intent as awareness of consequences. … It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979))).

Under both Title VII and § 1983, absent direct evidence of discrimination, courts apply the traditional burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).  Under this framework, a "plaintiff seeking to

prove disparate treatment through indirect, circumstantial evidence 'must first establish a prima facie case of prohibited discrimination.'" *Johnson v. Perez*, 823 F.3d 701, 706 (D.C. Cir. 2016). "[T]he burden then shifts to the defendant to 'articulate legitimate, nondiscriminatory reasons for the challenged employment decision.'" *Id.* At that point, the burden-shifting framework falls away and the court is left with a single question: "whether the employee 'produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race?'" *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1246 (D.C. Cir. 2011) (quoting *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

In deciding whether the employee has produced sufficient evidence to rebut the non-discriminatory reasons offered by the employer, the Court considers all relevant evidence including evidence underlying the employee's prima facie case; evidence the employee has presented to attack the employer's proffered explanation for its actions; and any additional evidence of discrimination that supports the employee or evidence to the contrary that supports the employer. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). An employee may attempt to show that the employer's proffered explanation is a pretext for discrimination with evidence that the employer is simply lying about the underlying predicate for

36

the employment action or with evidence suggesting that the employer treated other employees of a different race or gender more favorably in the same factual circumstances. *Brady*, 520 F.3d at 495. "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.*

Four employees—Addo, Burton, Florence, and Rayford—claim that the Department disciplined them because of their race. All four rely heavily on statistical evidence suggesting that, at the time, the Department disproportionately disciplined African-Americans. Addo Br. 9-11; Burton Br. 5; Pls. Br. 57-58. Some of the employees mistakenly claim that the district court excluded this evidence. *See, e.g.*, Burton Br. 11. This is not so. The court admitted the evidence, but found it insufficient to defeat the District's legitimate, nondiscriminatory reasons for disciplining the employees. RD 224 at 86-87.

The district court was correct. Even if this evidence may "constitute prima facie proof of a pattern or practice of discrimination," *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977), it does not create a material issue of fact as to the District's proffered reason for disciplining these particular employees. "[S]tatistical evidence is less significant" "[i]n individual disparate treatment cases" like this "because the ultimate issue is whether the *particular*

37

*plaintiff* was the victim of an illegitimately motivated employment decision." *Hairston v. Vance-Cooks*, 773 F.3d 266, 274-75 (D.C. Cir. 2014) (quoting *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984)) (emphasis added). Moreover, because Addo, Florence, and Rayford bring their claims directly under the Equal Protection Clause, they must satisfy an even higher burden by showing "intentional discrimination." *Vill. of Arlington Heights*, 429 U.S. at 264-65.

The District has proffered legitimate, nondiscriminatory reasons for imposing each of the disciplinary acts challenged here. The employees offer no admissible evidence to refute the underlying charges, and most concede that they engaged in the misconduct. *See* Addo Br. 4; Burton Br. 2-3; Pls. Br. 16-17, 19-21. They instead claim that they were penalized more severely than similarly situated Caucasian employees. Addo Br. 12-14; Burton Br. 13-14; Pls. Br. 41-56. But an employer's "disparate treatment of similarly situated employees may establish pretext … only if the plaintiff shows that all of the relevant aspects of his employment were nearly identical." *Royall v. Nat'l Ass'n of Letter Carriers*, 548 F.3d 137, 145 (D.C. Cir. 2008) (internal quotation marks omitted); *see Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). This "eliminate[s] other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—

discriminatory animus." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675-76 (7th Cir. 2012) (internal quotation marks omitted).   None of the employees' comparators satisfy this strict test.

### A.     Addo was not similarly situated to Caucasian employees who missed Clinic appointments, nor was he punished more severely.

Addo was suspended twice, for 12 and 24 hours, respectively, for missing Clinic appointments.  He argues that this discipline was discriminatory because, when two Caucasian employees failed to schedule annual physicals for six and seven years, neither "w[as] suspended for [his] first offense."  Addo Br. 12.  In 2008, Battalion Fire Chief L.A. was charged with insubordination for failing to schedule annual physicals for six years, from June 2001 through June 2007. AddoEx.I.  He agreed to a 300-hour suspension to resolve the matter.  AddoEx.I. The same year, Captain W.M. was charged for failing to schedule his annual physical for seven years; he too was suspended for 300 hours.  AddoEx.H.

Several factors distinguish these proposed comparators from Addo.  *First*, neither was the same rank—Addo ranked higher than Captain W.M. and lower rank than Battalion Fire Chief L.A.  "The similarity … must exist in all relevant aspects of their respective employment circumstances, which would surely include … their rank in the company … ."  *Hollins v. Fannie Mae*, 760 A.2d 563, 578 (D.C. 2000) (citation omitted); *see also Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011) (refusing to "disregard the titular differences between

39

assistant, associate, and full professors, as well as the differences between tenured and non-tenured professors," even though the defendant university "use[d] the same criteria for evaluating all professors"); *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. 2008) (rejecting comparators as similarly situated in part because "[n]one of them had the same position" as the plaintiff); *Hudson v. Chi. Trans. Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (rejecting comparators because they were at a higher rank than plaintiff).

*Second*, Addo and his comparators did not engage in the same misconduct. *See Hollins*, 760 A.2d at 578 ("[T]o be similarly situated, the plaintiff and the other employee must have 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"). The comparators were not on paid administrative leave and there is no evidence that scheduling their Clinic appointments had any effect on whether they could perform their duties. AddoEx.H, I. Addo, however, was on paid leave, recovering from an on-the-job injury, and the Department had a qualitatively different interest in ensuring he received the scheduled medical care. *See* AddoEx.BEx.9at3; AddoEx.B, Ex.10.

*Third*, nothing in the record suggests that either comparator had a history of discipline for neglect of duty, AddoEx.H, I, while Addo's first missed appointment, in June 2008, led to his *fifth* neglect-of-duty charge within three

40

years.  DCReplyEx.D; AddoEx.Bat92-93; *see Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (rejecting comparators due to "the disparity in their disciplinary history").

*Fourth*, the comparators' penalties—300-hour suspensions—were much more severe than Addo's.  AddoEx.H, I, F.  To be sure, his comparators missed more appointments over a longer period of time.  But they also did not get the benefit of "progressive discipline," which is designed to give employees a chance to learn from their mistakes.  Pl.Ex.12at38-39, 150; Pl.Ex.57at21.  Addo argues that "[i]f [his] missed appointment mandated 84 hours, then fairness dictates seven (7) missed appointments mandated 580 hours."  Addo Br. 13.  But under progressive discipline, the penalty is increased after every new infraction, and the proposal to suspend Addo for 84 hours, after he missed his third appointment in July 2008, was based on his *sixth* neglect-of-duty infraction in three years.  DCReplyEx.D; AddoEx.Bat92-93.  And the Department rejected this proposal, issuing only a 24-hour suspension.  AddoEx.F.  This, combined with his previous 12-hour suspension, resulted in 36 hours suspended for three missed appointments.  Thus, under his own flawed reasoning, he served only a third of the time for each missed appointment (12 hours) than his comparators (42 hours).  His proposed comparison thus would provide no non-speculative basis for concluding that the Department intentionally discriminated against him due to his race.

41

**B.     Burton offers no evidence that any other employee disobeyed a direct order by responding to a fire when told to disregard, or failed to comply with standard operating procedures by ensuring a continuous water supply before entering a burning building.**

Burton was suspended for disobeying a direct order and failing to lay out hose as standard operating procedure required.   Pl.Ex.1at113;  Pl.Ex.1at125; BurtonEx.Gat6.  He admits that he engaged in this misconduct, BurtonEx.Aat29-30; Burton Br. 2-3, but argues that his suspension was nevertheless motivated by race because Sergeant K.A. was not suspended after he asked his supervisor to remove him from a call so he could investigate a "large column of smoke." Pl.Ex.33.

K.A., however, was not similarly situated.  *First*, he was at a lower rank, which itself distinguishes him from Burton.  *See Hollins*, 760 A.2d at 578; *Montgomery*, 546 F.3d at 707.  Burton argues that the collective bargaining agreement "negates consideration of rank in discipline."  Burton Br. 14.  But the collective bargaining agreement does not govern the Court in determining whether the employees have offered non-speculative evidence that their discipline was substantially motivated by race.  The substantially similar test considers whether employees were the same rank because that "possible explanatory variable[]" must be eliminated to "isolate the critical independent variable—discriminatory animus."  *Good*, 673 F.3d at 675-76 (internal quotation marks omitted).

*Second*, K.A.'s infraction was completely different from Burton's. *See Hollins*, 760 A.2d at 578. K.A. did not disobey a direct order, which the trial board described as a "serious infraction." BurtonEx.G, BatesNo.111799. Indeed, the trial board distinguished Burton's infraction from that committed by K.A., noting that none of his comparators had asked and been denied for permission to respond. BurtonEx.G, BatesNo.111799. As it explained, Burton "is not charged with responding undispatched but with disobeying the order of a battalion fire chief." BurtonEx.G, BatesNo.111799.

Nor is there evidence K.A. violated standard operating procedures after he located the fire. Pl.Ex.33. Burton, however, created a dangerous situation by refusing to take "3rd due" as ordered, which would have increased hydrant pressure for a soon-to-arrive engine. BurtonEx.G, BatesNo.111800-01. Instead, he violated standard operating procedure by entering a burning building without ensuring a continuous water supply. BurtonEx.G, BatesNo.111800-01. Burton argues that "it was an impossibility to support a crew not in attendance." Burton Br. 10. But he does not dispute that five other engines had been dispatched to the scene, that the incident commander had already planned how to deploy the responding units to safely extinguish the fire, and that he interfered with those plans. *See* Burton Br. 2-3.

43

Burton's circumstances are also distinguished by his conduct after the incident, when he "steadfastly refused to accept responsibility for his inappropriate actions and continue[d]" throughout the disciplinary proceedings "to aggressively assert that he did nothing wrong." BurtonEx.G, BatesNo.111799-800. The trial board found this to be an "aggravating factor" in the severity of its proposed penalty. BurtonEx.G, BatesNo.111799. It also noted that "this incident became public through the efforts of [Burton] and his counsel and reflects poorly on the Department." BurtonEx.G, BatesNo.111802. Nothing in the record suggests that K.A. engaged in similar post-incident misconduct. *See* Pl.Ex.33.

Burton argues that the Department violated the collective bargaining agreement by assigning his case to a trial board after it had been heard by a deputy fire chief, who could only impose a short suspension, and then a battalion fire chief, who could impose a mid-range suspension. Burton Br. 11; *see* Pl.Ex.1at115-16; Pl.Ex.20at142. He also testified that it was improper for a captain who responded to the fire to serve as one of the four members of the trial board.[11] Pl.Ex.1at113. But the question here is not whether there were any procedural irregularities, but whether the Department disciplined Burton *because of his race*.

---

[11]     Burton argues that Chief Reilley offered "shifting and inconsistent explanations" for proposing discipline. Burton Br. 10. But he bases this entirely on his own testimony that Chief Reilley told him "good job" after the incident, which is inadmissible hearsay. Burton Br. 10, 11; *see* BurtonEx.Aat31.

And Burton has offered nothing more than speculation that the penalty imposed was so motivated.

Finally, Burton testified that he was not allowed to work overtime while he was suspended, but that J.F., a Caucasian firefighter, did work overtime while suspended.  BurtonEx.Aat155; Pl.Ex.1at232.  But he admitted that his testimony was not based on personal knowledge—it was "brought to his attention" by someone else.  BurtonEx.Aat155.  "'[P]ure hearsay' … 'counts for nothing in an opposition to summary judgment.'"  *Hernandez v. Pritzker*, 741 F.3d 129, 134 (D.C. Cir. 2013).  And, in any event, J.F.'s time-and-attendance records show that he received no overtime pay during two weeks he served his suspension.  Pl.Ex.28.

### C.    Florence offers no evidence that any Caucasian employees engaged in substantially similar sexual harassment of female employees.

Florence resigned after a trial board found him guilty of sexual harassment and proposed a demotion and a 168-hour suspension.  FlorenceEx.B.  Florence does not dispute that he engaged in the misconduct.  He nevertheless argues that the penalty was motivated by race, because Lieutenant J.C., who texted a photograph of his penis to a female EMT, was only demoted and not suspended.  Pls. Br. 42-43; *see* FlorenceEx.Hat1.

J.C. was not similarly situated to Burton.  *First*, his infraction was different.  *See Hollins*, 760 A.2d at 578.  Florence made inappropriate face-to-face comments

45

to K.C., while he was on duty, in the workplace, acting as her supervisor. FlorenceEx.A, BatesNo.104228.  J.C., however, was not on duty when he texted a picture of his penis to a female EMT.  *See* FlorenceEx.H, I.  Florence argues that the "record is silent" on whether J.C. was on duty, but he did not dispute the District's statement of undisputed material fact that J.C. "was off duty and out of uniform when he sent a picture of his penis to a coworker."  RD 202-8 at 10.  The court thus could take as conceded that "this proffered comparator did not engage in sexual misconduct while on duty."  RD 224 at 96; *see Potter v. District of Columbia*, 558 F.3d 542, 548 (D.C. Cir. 2009) (explaining how, under the district court's local rules, "the moving party must submit a statement of material facts as to which it asserts there is no genuine issue, D.D.C. R. LCvR 7(h), and the district court may accept these facts as true if the opposing party does not dispute them").

Moreover, for "'[i]nstances of disparate treatment to support a claim of pretext,'" the "'[plaintiff] has the burden of proving that he and the disparately treated [employees] were similarly situated in all relevant respects.'"  *EEOC v. Kohler Co.*, 335 F.3d 766, 775-76 (8th Cir. 2003) (quoting *Lynn v. Deaconess Medical Ctr.-W. Campus*, 160 F.3d 484, 487 (8th Cir. 1998)); *see also Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999) ("Where, as here, the plaintiff in a disparate treatment race discrimination case offers comparative evidence in his quest to raise an inference of racial discrimination, he must provide

46

a suitable provenance for the evidence by showing that others similarly situated to him in all relevant respects were treated differently by the employer."). Florence bears the burden of disproving the District's legitimate, nondiscriminatory reason for penalizing him—if the record is silent on, for instance, whether J.C. was on duty, a jury would have to speculate to find in his favor. But "speculations and allegations" are "insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999).

*Second*, Florence was not penalized by the same decisionmakers as J.C. "Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline an employee." *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008). "So, to be similarly situated, a [comparator] must have been treated more favorably by the same decisionmaker that fired the [plaintiff]." *Id.* As the district court explained, the Fire Chief was the final decisionmaker for all discipline imposed by the Department, so for most of the employees' claims "the involvement of different supervisors … does not weigh as heavily as in other employment discrimination cases." RD 224 at 88. But Florence resigned before the trial board's recommendation was ever finalized— before the Fire Chief could adopt, modify, or dismiss the board's proposed penalties. Pl.Ex.36. To the extent the trial board's recommendation can even be

47

considered an adverse action, the board's members were the decisionmakers.  And there was no overlap in the four members of the trial boards for Florence and J.C. *Compare* FlorenceEx.B, BatesNo.105265, *with* FlorenceEx.H, BatesNo.46512. Had Florence stayed in his position and waited for a final decision from the Fire Chief, his suspension may well have been eliminated altogether, making his penalty identical to that of J.C.

Alternatively, the District is entitled to judgment as a matter of law on Florence's claim because he did not suffer an adverse action.  The trial board's decision was not final when he retired, and he may well have persuaded the Fire Chief that he was wrongly accused and avoided penalty altogether.  *See* Pl.Ex.36. But he did not stay and fight the charges.  Instead, rather than risk a reputation as a sexual harasser, Florence voluntarily resigned.  FlorenceEx.Cat45; Pl.Ex.36.  He claims this was a constructive discharge.  Pls. Br. 38-39.  But "a retirement request initiated by an employee is presumed to be a voluntary act."  *Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004) (quoting *Schultz v. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)).  "For a resignation to be rendered involuntary on account of duress, … the employee's circumstances [must] permit no alternative but to accept."  *Id.*  Florence at least had the alternative of appealing.

Moreover, even setting that aside, "where an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such

48

limited choices do not make the resulting resignation an involuntary act." *Id.* As the district court explained, the "contention that Florence chose to retire to avoid demotion and any associated stigma cannot raise an inference that Florence was subject to constructive termination." RD 224 at 95-96.

### D. Rayford offers no evidence of pretext in his suspension or termination.

1. Rayford does not identify any other employees charged with misleading their supervisors into believing they were carrying a valid driver's license.

Rayford was suspended for 72 hours for driving at an unsafe speed on wet roads and colliding with a parked car, failing to carry his driver's license, and knowingly flashing his non-driver's personal identification at morning lineup to mislead his supervisor into believing he was carrying his driver's license. RayfordEx.C. Rayford offers no evidence suggesting the Department could not reasonably believe that he engaged in this misconduct. *See Brady*, 520 F.3d at 495 ("If the employers stated belief about the underlying facts is reasonable in light of the evidence, … there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."). To be sure, he claims in his brief that he "had his driver's license on his person," and that the district court "assume[d] facts into evidence" when it found otherwise. Pls. Br. 19 (citing RayfordEx.Aat42); Pls. Br. 51 (citing RD 224 at 101). But he cites only a single page of his deposition, which does not even mention his driver's license. Pls. Br.

49

19 (citing RayfordEx.Aat42). And the record *does* include considerable evidence that the trial board penalized him for failing to carry his driver's license as well as attempting to mislead his supervisor into believing his personal identification card was actually his driver's license. *See* RayfordEx.C. Indeed, the trial board's decision recounts the testimony of Rayford's supervisor that Rayford had shown him a valid driver's license, of the investigating police officer that he recognized the card as a non-driver's identification, and of Rayford himself that he later "found his license in the laundry." RayfordEx.C, BatesNo.77421.

Rayford argues that he was treated less favorably than similarly situated Caucasian employees involved in minor motor vehicle accidents, but the record does not support this claim. Pls. Br. 49-50. *First*, the infractions were different. *See Hollins*, 760 A.2d at 578. The primary comparator Rayford identifies, D.S., was charged only with "unsafe driving." *See* Pls. Br. 20, 50-51 (citing RayfordEx.B, Case No. U-07-218); AnthonyWilliamsEx.L, BatesNo.42396. Rayford cites no evidence to support his claim that D.S. was charged for a motor vehicle accident or failing to carry his driver's license, and he does not even suggest that D.S. attempted to convince his supervisor that he was carrying a valid driver's license when he was not. *See* Pls. Br. 20. Nor is there evidence that the other Caucasians who allegedly "received more lenient discipline" for minor motor

vehicle accidents had engaged in this misleading conduct.[12] AnthonyWilliamsEx.L, BatesNo.42395-96.

*Second*, the trial board admitted it was giving Rayford an "enhanced penalty," explaining that this was based on his "prior record of misconduct" and "disciplinary record for the past three years." RayfordEx.C, BatesNo.77420-22. Rayford points to nothing in the record that suggests his comparators had a prior record of misconduct. *See Amrhein*, 546 F.3d at 860.

*Third*, the same year six Caucasians received lenient penalties for minor motor vehicle accidents, *eleven* African-American employees received the same lenient treatment. AnthonyWilliamsEx.L, BatesNo.42395-96. Thus, as the district court noted, Rayford has improperly "cherry-picked discrete instances of disciplinary actions … to bolster [his] claim of racially disparate discipline." RD224 at 90 n.25.

> 2. Rayford does not identify any other employees who tested positive for marijuana but were excused from the substance-abuse program.

Rayford resigned in lieu of termination after he tested positive for marijuana while he was in the substance-abuse program. RayfordEx.E, BatesNo.106954; RayfordEx.H. He does not dispute the grounds for termination—that he tested

---

[12]   Rayford also cites his own deposition testimony, which described his recollection of a document detailing disciplinary actions. Pl. Br. 20 (citing RayfordEx.A43-45). The testimony, however, is inadmissible hearsay.

positive for marijuana twice in the same year, and that he submitted an adulterated urine sample for testing. *See* Pls. Br. 51-56. Instead, he argues that the Department "enforced [the substance-abuse policy] against [him] but not against Caucasians." Pls. Br. 51-52. He tries to compare his case to K.B., who tested positive for illegal drugs, but does not acknowledge that K.B. was enrolled in the substance-abuse program *as a result* of that drug test. RayfordEx.I-J. To be sure, the violation for which K.B. was referred was his second, RayfordEx.I, but it does not follow that the "[Medical Services Officer] elected not to refer [him] to the substance abuse program on his first violation." Pls. Br. 53. K.B. may well have violated the policy more than a year earlier and successfully completed his rehabilitation before his second infraction. On this record, a jury would have to speculate to find that K.B. was given more favorable treatment than Rayford, and thus summary judgment was warranted. *See Brown*, 199 F.3d at 458-59.

Rayford's showing as to other proposed comparators is even more plainly insufficient. Neither J.F. or M.D. tested positive for illegal drugs; they were charged with alcohol-related driving offenses. RayfordEx.L; Pl.Ex.30. This is an important distinction, because alcohol is not an illegal drug and enrollment in the substance-abuse program is required only when an employee tests higher than .020 on a "properly used, calibrated, inspected, and maintained breathalyzer." RayfordEx.Dat3, 12. Rayford has offered no evidence as to the level of

52

intoxication of J.F. or M.D. or how that level was measured.[13]  Moreover, Rayford

offers nothing but speculation that J.F. and M.D. were not placed in the substance-

abuse program.  RayfordEx.Aat25; *see* RayfordEx.K-L, Pl.Ex.30.  And there is no

evidence that Rayford's final comparator, D.G., ever violated the substance-abuse

policy—the record shows only that he was charged with shoplifting *over-the-*

*counter* drugs.  RayfordEx.F; Pls. Br. 22.

## II.   Nelson Offered Insufficient Evidence That The District Of Columbia Discriminated Against Him In Its Administration Of The 2010 Promotional Exam.

### A.   Nelson has not shown that the procedures he challenges were caused by a policy or practice of the District of Columbia.

"Plaintiffs who seek to impose liability on local governments under § 1983

must prove that 'action pursuant to official municipal policy caused their injury.'"

*Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (quoting *Monell*, 436 U.S. at

694).  "Official municipal policy includes the decisions of a government's

lawmakers, the acts of its policymaking officials, and practices so persistent and

widespread as to practically have the force of law."  *Id.*  In short, the District is

liable only for unconstitutional violations "for which [it] is actually responsible."

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (plurality op.).

---

[13]    Rayford argues that M.D. was a "probationer" and therefore should have been terminated for his first offense.  Pl. Br. 55.  The record he cites, however, indicates that M.D. was a firefighter/paramedic.  Pl.Ex.50.

Plaintiffs therefore must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986).

Establishing that a constitutional injury was caused by a municipal policy is relatively straightforward when the government has directly violated the Constitution through the promulgation of explicit policy, *see Monell*, 436 U.S. at 694-95, or an unconstitutional decision or action of a policymaker, *see St. Louis v. Praprotnik*, 485 U.S. 112, 123-30 (1988). But "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof." *Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997). "[A] city's inaction, including its failure to train or supervise its employees adequately, constitutes a 'policy or custom' under *Monell* when it can be said that the failure amounts to '"deliberate indifference"' towards the constitutional rights of persons in its domain." *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (2000) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388-89 & n.7 (1989) (recognizing liability under § 1983 for failure to train adequately), and citing *Rogala v. District of Columbia*, 161 F.3d 44, 56 (D.C. Cir. 1998) (recognizing liability for failure to train or supervise), and *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C.

54

Cir. 1997) (noting that "inaction giving rise to or endorsing a custom" can be basis of § 1983 liability)).

"'Deliberate indifference' … is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410; *see Baker v. District of Columbia*, 326 F.3d 1302, 1306-07 (D.C. Cir. 2003). To satisfy this standard, a plaintiff must prove that: a government policymaker knew or should have known of a specific training need; failure to address that need would likely result in the violation of individual constitutional rights; and the policymaker was deliberately indifferent to the need for such training. *Canton*, 489 U.S. at 388. This often is shown by specific statistical evidence, or by setting forth a series of similar incidents known to municipal policymakers, who then failed to address the problem. *Carter*, 795 F.2d at 124-26. The standard "does not require the city to take reasonable care to discover and prevent constitutional violations." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). "It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Id.* "A showing of simple or even heightened negligence will not suffice." *Bryan Cty.*, 420 U.S. at 407.

Thus, a plaintiff must "present concentrated, fully packed, precisely delineated scenarios." *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C.

55

Cir. 1988) (internal quotation marks omitted).  While particularly "[e]gregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question," even a "catalog of disquieting events is not sufficient to demonstrate a pervasive pattern" where the "occurrences … do not coalesce into a discernible 'policy.'"  *Carter*, 795 F.2d at 123-24.

Nelson offers insufficient evidence to satisfy this standard on his claim that the District intentionally discriminated in its administration of the 2010 promotional exam.  In the district court, other employees relied on documents raising an inference of racial disparity in employee discipline.  RD 202 at 23-27; *see* RD 224 at 65.  But even assuming, for purposes of this appeal, that this evidence raises an inference of deliberate indifference to disparate discipline, it cannot raise an inference of deliberate indifference to an allegedly discriminatory exam process.  "Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official."  *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).  But to satisfy *Monell*, "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."  *Id.*  No such link exists here.

56

### B.     Alternatively, Nelson has not shown any evidence of racial bias in the exam process.

Nelson claims that the Department "tamper[ed]" with the scoring of the 2010 exam scores to ensure that Caucasians ranked higher on the promotional list than African-Americans, and that this adversely affected *his* ranking, which delayed his promotion. *See* Nelson Br. 16, 20. He supports this with evidence that: (1) candidates were required to write their names on their exams; (2) the first 13 candidates on the promotional list for lieutenant were Caucasian; and (3) the Department allowed the exam to proceed after one of the subject matter experts violated his sequester by speaking to Department employees.[14] *See* Nelson Br. 16, 19, 22.

None of this evidence is sufficient to cast doubt on the District's legitimate, nondiscriminatory reason for placing Nelson 96th on the promotional list: that other candidates scored higher on their exam. Nelson argues that "[t]he changing of procedure mid-testing"—by requiring candidates to write their names on their tests—is "evidence of tampering." Nelson Br. 16. But he offers only speculation that it was the Department, rather than the independent contractor hired to administer the exam, that decided to require candidates to include their names. *See*

---

[14]     Nelson mistakenly argues that the district court rejected this evidence as hearsay, Nelson Br. 14, 17, 19, but it accepted this evidence and rejected the claim after taking the evidence in the light most favorable to him, RD 224 at 76-80.

NelsonEx.Aat15, 25-29.  A jury would likewise have to speculate to find that it was the Department, rather than the contractor, that scored the exams.  *See* NelsonEx.Aat15, 25-29.  Nelson notes that, when the district court described the exam process, it wrote that the Department "*produces* and *disseminates* a ranking." Nelson Br. 12.  But this description is not itself evidence, nor can it refute the District's evidence that the test was administered by an independent contractor. *See* NelsonEx.A, Ex.4at1 ("The promotional examinations have been developed by Industrial Organizational Solutions, Inc. (I/O) and will be administered cooperatively by I/O and the District of Columbia Office of Human Resources (DCHR).").

And even if the Department itself administered and scored the exam, the fact that it had the opportunity to tamper with the scores is not evidence that it actually did so.  *Cf. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1319 (11th Cir. 2003) ("[T]he mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy.").  As the district court noted:

> what is missing is any evidence whatsoever that such tracing occurred in order to advantage only white test-takers.  The plaintiffs have failed to support their theory with any evidence that the original, correct scores on the tests bearing applicants' names were altered in any way to produce the final rankings.  The complete absence of such corroborative documentary evidence is particularly noteworthy in light of the extensive opportunity for discovery provided to the plaintiffs, which included the production by the District of "all

58

examination files for employees who sat for the 2006, 2008, and 2010 promotional examinations."

RD 224 at 77.  Moreover, Nelson concedes that his 2008 ranking (32nd out of 36 candidates) was not "significant[ly] differen[t]" from his 2010 ranking (96th out of 104).  NelsonEx.Aat36, 42.  *Compare* NelsonEx.A, Ex.6, BatesNo.48694, *with* NelsonEx.A, Ex.8, BatesNo.48747; *see also* NelsonEx.A, Ex.7, Ex.9.

Nelson likewise speculates when he argues that the Department was motivated by race when it decided to proceed with the exam despite a violation of sequester by R.L., one of the subject matter experts assigned to the team.  The subject matter panel was to rate the difficulty level of each multiple-choice question and establish a qualifying score.  NelsonEx.F; NelsonEx.AEx.4at3.  The Department "removed [R.L.] from the subject matter expert panel significantly before the 2010 promotional exam was written," so his violation "did not affect the 2010 promotional examination."  NelsonEx.Fat2.  Nelson does not refute this evidence.

III.    **Botts Offered Insufficient Evidence That The District Of Columbia Discriminated Against Him By Detailing Him To The Training Academy.**

A.    **Botts has not shown that any exemption for Caucasian fire inspectors was caused by a policy or practice of the District of Columbia.**

Botts does not challenge the Department's racially neutral policy of requiring all employees, including fire inspectors, to maintain EMT certification.[15] Pls. Br. 38.  Rather, "he challenges the District's discriminatory application of its policy, requiring him, but not Caucasian Fire Inspectors, to take and pass this training."  Pls. Br. 38.

Botts has offered no evidence that this allegedly discriminatory application of the requirement was caused by a District policy or practice.  *See Monell*, 436 U.S. at 694-95.  He relies entirely on documents raising an inference of racial disparity in employee discipline.  Pls. Br. 30-31; *see* RD202at23-27; RD224at65. This evidence does not raise an inference of the District's deliberate indifference to any racial disparity in enforcing the training requirements.  *See Okla. City*, 471 U.S. at 823 ("At the very least there must be an affirmative link between the policy

---

[15]    Botts argues that he "was told he did not need an EMS card while working in the Fire Marshal's office," but none of the evidence he cites refers to the Department's new requirement, in 2009, that all employees obtain NREMT certification. *See* Pl. Br. 11-12.

and the particular constitutional violation alleged."). The District is therefore entitled to judgment as a matter of law on this claim.

**B. Alternatively, Botts has offered no evidence that Caucasian fire inspectors were exempt from the EMT certification requirement.**

Botts offers only hearsay to support his claim that the Department did not require Caucasian fire inspectors obtain NREMT certification. A Department chief "told [him] that … a lot of white guys" were not required to attend the Training Academy. BottsEx.Aat78. He "was told" by a sergeant that "75 to 100 white firefighters" hired before 1987 were excused from the training. BottsEx.Aat78-79. Another firefighter whose certification had expired told Botts that, if the Department made him attend the training, he would not participate in the Department's "barbecue cookoff," "[s]o … he didn't have to go." BottsEx.Aat77. Botts also attested that "one of the A[.] brothers" was not required to attend, but he offered no evidence that this was based on personal knowledge supporting this claim. BottsEx.Bat13. He also refers to the deposition of Firefighter Albert Montgomery (without citing page numbers), who testified—without any indicia of personal knowledge—that at some point he saw a list of Caucasian firefighters who were not EMT certified. Pls. Br. 13 (citing "Montgomery – Ex. 19); *see* Pl.Ex.19at56-59. The district court properly rejected this hearsay. RD 224 at 82. *See Hernandez*, 741 F.3d at 134.

61

The court also properly found the employees' claims of disparate enforcement impossible to reconcile with "the documentary record evidence that nearly all [Department] firefighters—of all races—had obtained NREMT certification by December 2010."  RD 224 at 82; *see* RD 224 at 14; JohnsonEx.I, BatesNo.122990.  Botts argues that the policy was not applied evenhandedly as to his particular part of the Department, the Fire Marshal's Office, Pl. Br. 38, but the record does not support his claim.  Thirty-two employees worked there: nineteen fire inspectors including Botts, three fire inspector technicians, and ten armed investigators.  JohnsonEx.I, BatesNo.122990.  Other documents demonstrate that at least one of these fire investigators, K.M., is Caucasian.  Pl.Ex.24at2; Pl.Ex.61at27.  And Botts has offered no evidence that there were more Caucasian members of the fire investigations unit—which was "entirely African-American" in 2007, *Bowyer v. District of Columbia*, 793 F.3d 49, 51 (D.C. Cir. 2015)—or that any Caucasian members were exempted from NREMT certification.  Nor is the absence of some employees from the training lists evidence that they were exempted from the certification requirement.  *See* Pls. Br. 13 n.2.  After all, these employees may well have already been certified EMTs.  Indeed, Botts cites testimony (albeit hearsay) that some employees who lived outside of the District "were getting their [certification] where they lived."  Pls. Br. 13 (citing Pl.Ex.4at39-40).  He has not explained how allowing employees to obtain

62

certification on their own time (and presumably with their own money) amounts to discrimination against those who drew a full salary while detailed to the Training Academy to obtain their certification.  Botts has simply failed to demonstrate any racial disparity in the training requirement, much less the type of intentional discrimination required to state a claim under § 1983.

## IV.   Addo, Botts, and Rayford Have Offered Insufficient Evidence That The District Of Columbia Subjected Them To A Hostile Work Environment Due To Race.

To demonstrate a hostile work environment, an employee "must first show that … []he was subjected to 'discriminatory intimidation, ridicule, and insult' that [was] 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'"  *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).  "More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003) (quoting ).

### A.   The employees have not shown that the hostility they allegedly encountered was caused by a policy or practice of the District of Columbia.

The employees' claims are brought under § 1983, and "a city [cannot] be held liable under § 1983 based upon theories akin to *respondeat superior*."  *Okla. City*, 471 U.S. at 818 (citing *Monell*, 436 U.S. at 694).  Thus, in addition to proving

that they endured a race-based hostile work environment, the employees must prove that it was caused by a policy or practice of the District.

To satisfy their burden, Addo, Botts, and Rayford rely entirely on documents raising an inference of racial disparity in employee discipline.  Addo Br. 2-3; Pls. Br. 30-31; *see* RD 202 at 23-27; RD 224 at 65.  This evidence cannot satisfy their burden of proving the District's deliberate indifference to a hostile work environment—an entirely different type of claim.  *See Okla. City*, 471 U.S. at 824 (requiring "causal connection between the 'policy' and the constitutional depravation"); *Carter*, 795 F.2d at 124-26 (holding that plaintiff had not proven policy or custom where his "statistics … were too general to prove any pattern or policy, and their specific instances were too scattered and lacking in detail to build a case").

**B.    Alternatively, none of the employees have offered sufficient evidence of a race-based hostile work environment.**

1.    Addo has offered only conclusory evidence that he endured more than a few isolated instances of hostility or that this hostility was substantially motivated by race.

Addo has offered insufficient evidence that his working environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment."  *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005).  "Courts may grant summary

judgment to a defendant where a plaintiff's evidence is vague or conclusory." *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).

Addo testified at length about Greene's attempts to "discredit," "demean," and "belittle" him, but his testimony was vague and unsupported by meaningful detail. AddoEx.Bat20-21; *see* Addo Br. 22-29, 34, 43-56. He testified to only four concrete examples over a three-year period: (1) a reprimand for mailing an e-mail that his computer would not send, AddoEx.Bat29-30; (2) a reprimand for failing to "give a proper size-up" after an incident, AddoEx.Bat57-58; (3) an instance when he used his radio to tell dispatch where his unit was responding and Greene said he "didn't hear [Addo's] response," AddoEx.Bat22; and (4) a time when, after he accused Greene of "nit-picking" because Addo was "a black officer," Greene responded that Addo should "just retire if you don't like what I'm doing to you," AddoEx.Bat28. He testified that DiPietro "may" have initiated the discipline for missing Clinic appointments. AddoExBat21. These "isolated incidents" cannot establish a hostile work environment under Title VII, *Lively*, 830 A.2d at 888, much less the type of "discriminatory intent" required to establish a claim under § 1983, *Huff v. Sheehan*, 493 F.3d 893, 902 (7th Cir. 2007).

Moreover, "Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of [race]." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002). So too under § 1983. *Andrews v. City of Phila.*,

65

895 F.2d 1469, 1482 (3d Cir. 1990). Thus, in *Stewart*, despite the severity of a "profane tirade" from an employee's supervisor, this Court affirmed dismissal of her sex-based hostile work environment claim, because his offensive and inappropriate language "cannot reasonably be construed as … having been motivated by a discriminatory animus." 275 F.3d at 1129, 1133; *see also Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (affirming summary judgment because the employee's "list of grievances includes none of the racial comments or ridicule that are hallmarks of hostile work environment claims"); *Neuren*, 43 F.3d at 1513 (holding that supervisor's use of vulgarity in employee's performance evaluation was "obviously grounded in gender-neutral concerns about [plaintiff's] interpersonal relations with co-workers, rather than discriminatory animus").

Addo offers nothing but speculation that the hostility he encountered from Greene and DiPietro was based on his race. He described both supervisors' conduct in similar terms. Greene "was constantly trying to discredit," "demean," and "belittle" him and "[would] constantly haggle [him] about little things." AddoEx.Bat20-21. And DiPietro was "constantly … trying to look for something," "try[ing] to … find little things … to make [him] look insubordinate or incompetent." AddoEx.Bat56. Thus, even if these vague and conclusory claims were corroborated with concrete examples, the supervisors' racially neutral

66

conduct would not create a sufficient inference of a race-based hostile work environment.  *See Stewart*, 275 F.3d at 1133; *Andrews*, 895 F.2d at 1482.

Addo testified repeatedly that Greene and DiPietro's hostility was based on race, but he offered nothing more than his own conclusory opinion as proof. AddoEx.B22-29, 34, 43, 45-51, 53-56; *see Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) (rejecting "purely conclusory" allegations of discriminatory animus at summary judgment).  He testified that Greene did not treat the Caucasian sergeant in the house the same way, but he offered no additional detail or examples.  *See* AddoEx.B23 (Greene "got along very well" with white employees), 43 (Greene "kept negatively coming at" Addo, but "didn't do it towards white people), 54 (Greene and DiPietro "would treat the white guys differently").  He testified that he "saw [Greene's racial animus] in his ways" and "with his eyes." AddoEx.B27, 47.  So too for DiPietro—Addo testified that his racial animus was apparent from "[t]he way he looked at you."  AddoEx.B55-56.  These "bare allegations of discrimination," uncorroborated by any race-based language or conduct, "are insufficient to defeat [the District's] properly supported motion for summary judgment."  *Burke v. Gould*, 286 F.3d 513, 520 (D.C. Cir. 2002).

> 2.    Botts has not shown that he suffered severe and pervasive race-based hostility.

"In evaluating a hostile work environment claim, the court 'looks to the totality of the circumstances, including the frequency of the discriminatory

67

conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013). The "mere utterance of an … epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Stewart*, 275 F.3d at 1134 ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment.").

Botts has not offered evidence of a workplace "permeated with discriminatory intimidation, ridicule, and insult." *George*, 407 F.3d at 416. Instead, he claims seven discrete incidents over a period of at least seven years: (1) his detail to the Training Academy for EMT certification, BottsEx.Aat76; (2) a time he overheard a lieutenant using racial slurs, Pl.Ex.3at37-38; (3) a lengthy delay in his pay increase he was promoted, BottsEx.A, Ex.9, BottsEx.Bat5; (4) an incident where someone put charred glass in his gear, Pl.Ex.3at41-42; (5) an incident where someone keyed his and other African-Americans' cars, but "none of the white firefighters[']" cars, Pl.Ex.3at34; (6) an incident where someone broke into his car, BottsEx.Aat46; and (7) an incident where someone rummaged through

his locker, BottsEx.Aat46.[16]  These "isolated incidents" cannot raise an inference that he suffered a hostile work environment.  *See Lively*, 830 A.2d at 888.

Moreover, the record only supports an inference of racial animus for two of these events: the overheard racial slur and the keying of several African-American firefighters' cars.[17]  As for the various other proffered bases for Botts's claim, all employees, including fire inspectors, were required to obtain EMT certification.[18] *See* JohnsonEx.I, BatesNo.122990.  The Department resolved Botts's delayed pay increase as soon as he complained about the problem.  BottsEx.C.  The Metropolitan Police Department investigated the incident where someone put charred glass in his gear, but found nothing, Pl.Ex.3at44, BottsEx.Aat45, belying Botts's accusation that the Department "did not investigate his claim," Pls. Br. 15. And there is no evidence that the person who broke into his car or rummaged through his locker was motivated by race.  *See* BottsEx.Aat46.  Thus, as the district court properly held, Botts offered "no evidence that [he] himself was subjected to any unwelcome harassment" or "that these distinct instances constituted … more

---

[16]     Botts also testified to a time when a newspaper reporter told him that other firefighters had used racial slurs.  Pl.Ex.3at38.  This is inadmissible hearsay.

[17]     Even this is uncertain, as there is no evidence the cars were keyed by a Department employee.  Pl.Ex.3at34.

[18]     Botts claims "Chief A. ordered [him] to take the test in successive sessions, telling [him] that if he did not take the exam, he would be charged and terminated." Pl. Br. 12.  But the page of his deposition he cites for this allegation, Pl.Ex.3at103, is not in the summary judgment record.

than an 'array of unrelated discriminatory … acts.'"   RD 224 at 121 (quoting

*Baird*, 662 F.3d at 1252).

**C.    Rayford has not shown that he suffered any workplace hostility, much less that it was based on race.**

Rayford bases his hostile work environment claim on his claims of disparate treatment in: (1) his trial-board proceedings and suspension for unsafe driving that resulted in a traffic accident, and for misleading his supervisor into believing he was carrying his driver's license when he was not; and (2) his enrollment in the substance-abuse program after he tested positive for marijuana.   Pls. Br. 64.   As discussed, he has offered no evidence that either action was racially motivated. And even if they were, they do not support his claim that his workplace was so permeated with racial hostility that it "alter[ed] the conditions of [his] employment and create[d] an abusive working environment."   *Brooks*, 748 F.3d at 1276.

70

## CONCLUSION

This Court should affirm the district court's entry of summary judgment in favor of the District.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

LOREN L. ALIKHAN
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
holly.johnson@dc.gov

October 2016

## CERTIFICATE OF SERVICE

I hereby certify that, on October 20, 2016, this certificate was served through

the Court's ECF system to:

Donna Williams Rucker, Esq.
Tully & Rinckey PLLC
815 Connecticut Avenue, NW, Suite 720
Washington, D.C. 20006

Donald M. Temple, Esq.
Temple Law Offices
1101 15th Street, NW, Suite 203
Washington, D.C. 20005

and via first-class mail to:

Gerald Burton
7310 Powhatan Street
Lanham, MD 20706

Wayne Nelson
P.O. Box 193
Accokeek, MD 20607

/s/ Holly M. Johnson
HOLLY M. JOHNSON

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 16,034 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point.

/s/ Holly M. Johnson
HOLLY M. JOHNSON